[S. F. No. 15818. In Bank.—June 27, 1940.]

JULIA F. MORRISON, Appellant, v. THE MUTUAL LIFE INSURANCE OF NEW YORK (a Corporation), Respondent.

A. Don Duncan for Appellant.

F. Elred Boland, Knight, Boland & Riordan and R. M. Sims, Jr., for Respondent.

GIBSON, C. J.—This is an action by plaintiff, the beneficiary under a policy of insurance on the life of her husband, to recover the amount of said policy from defendant insurance company. The company defends on the ground that prior to his death the insured surrendered the matured policy and received its cash surrender value.

Plaintiff Julia F. Morrison and the insured John W. Morrison were married in Leadville, Colorado, in 1893. The marriage continued until the death of John Morrison on May 20, 1932. However, the parties separated in 1918 and lived apart thereafter.

In June, 1904, John Morrison made a written application to defendant company for a policy of life insurance in the sum of $2,000, payable to his wife as beneficiary. The policy, known as a "Twenty Payment Life" was duly issued. It provides that after payment of twenty yearly premiums it would be fully paid up. It contains provisions for cash surrender value and a reservation by the insured of the power to change the beneficiary, as follows: "The insured may, from time to time during the continuance of this policy change the beneficiary or beneficiaries by written notice accompanied by this policy, to the Company at its Head Office in New York City. . . . "

The policy was formally executed in the New York office of defendant company, and delivered by the soliciting agent in Colorado to plaintiff, the beneficiary. She paid all of the premiums out of her own earnings and kept the policy until December 3, 1918. At this time her husband, apparently without her knowledge or consent, obtained possession of it and never returned it.

In June, 1924, the policy was fully paid up. Some time in April, 1925, John Morrison, the insured, exercised the right of surrender to obtain its cash value from the company. A check in the sum of $1372, representing payment in full of such cash surrender value, was issued to the joint order of the insured and the beneficiary. John Morrison forged his wife's name, indorsed his own and cashed the check, using the proceeds for his own purposes.

In March, 1933, some months after her husband's death, plaintiff made demand on the company for the proceeds of the policy. After some negotiations the company refused, relying on its prior payment to the insured of the full cash surrender value. The present action followed, in which the lower court made findings against plaintiff on all the material issues, and gave judgment for defendant.

Plaintiff attacks the judgment on two theories: First, that the named beneficiary is under the law the owner of the policy; and second, that she became the owner by virtue of an agreement with her husband.

█ The first theory is based upon the well-established rule that the naming of the beneficiary in a life insurance policy has the effect of giving that beneficiary a vested right in the policy, so that he becomes in fact the owner of the contract and is protected against any interference with his rights by later acts of the insured or the company. The insured may in such a case neither change the beneficiary nor assign the policy, and he cannot surrender or cancel it. (See Vance on Insurance, 2d ed., pp. 542, 548, 551.) █ The establishment of this rule made it clear that if the insured wished to retain control over the policy he would have to make special provision in the policy therefor. Accordingly it became customary in many policies to reserve to the insured the power to change the beneficiary, and also other powers, such as the power to pledge the policy to secure loans, to assign it, or to surrender it and obtain the cash surrender value. The most common and the most important reservation, however, is that dealing with change of beneficiary. Where this power is reserved, the question arises as to its effect upon the rights of the beneficiary as owner of the policy.

It is perfectly clear that where the power is reserved, such change may be made, and the beneficiary's ownership is thereby wholly divested. If in the instant case the insured

had exercised his power to change the beneficiary in accordance with the provisions of the policy, the beneficiary's rights would have been terminated. ■ But the insured did not change the beneficiary, and the question is whether the reserved power to make such change has the effect of destroying what would otherwise be a vested right under the policy. On this point there is some conflict among the authorities. A few courts take the view that the beneficiary remains the owner of the policy with an interest which is vested and absolute until the power of change is exercised. Under this view the unexercised power has no effect upon the beneficiary's rights, and therefore until the change is made the insured may not assign or surrender the policy. (See, e. g., *Roberts* v. *Northwestern Nat. Life Ins. Co.*, 143 Ga. 780 [85 S. E. 1043]; *Hill* v. *Capitol Life Ins. Co.*, 91 Colo. 300 [14 Pac. (2d) 1006]; *Indiana Nat. Life Ins. Co.* v. *McGinnis*, 180 Ind. 9 [101 N. E. 289, 45 L. R. A. (N. S.) 192].) This view has been strongly criticized on principle, and has been rejected by the great majority of the courts. The modern view is that the insured, by reserving power to change the beneficiary, has retained complete control over the policy, and in consequence the beneficiary has only an expectancy and not a vested right. The actual exercise of the power to change the beneficiary is not important, but is a mere formal requirement for the protection of the company. The company may, as against the insured, insist that this procedural step be taken, but the beneficiary's right is subject to termination in other ways, whether the formal change is made or not. In short, where the power to change beneficiary is reserved, the beneficiary has an expectancy and will receive the proceeds of the policy if it is in force at the insured's death with the beneficiary unchanged; but in the meantime, the insured's control is absolute, and he may pledge, assign, or surrender the policy at will. (See *Antley* v. *New York Life Ins. Co.*, 139 S. C. 23 [137 S. E. 199, 60 A. L. R. 184]; *La Londe* v. *Roman Standard Life Ins. Co.*, 269 Mich. 330 [257 N. W. 834]; *Davis* v. *Modern Industrial Bank*, 279 N. Y. 405 [18 N. E. (2d) 639]; Vance on Insurance, 2d ed, pp. 561, 562, 568; note, 24 Corn. L. Q. 607.)

These conflicting views have been stated in order that the nature of the problem may be clearly understood. However, it is unnecessary for us to engage in any extended examina-

tion of the decisions throughout the country generally. The policy was executed in New York at the head office of the company, and by its terms it is provided that premiums are to be paid at such head office, and that proceeds are likewise to be paid there upon proof of death. The application, expressly made a part of the policy, provides that the proposed contract is subject to the laws of New York. And appellant herself insists that New York law governs. We therefore in accordance with this concession limit our inquiry to the right of the wife-beneficiary under the law of New York.

Plaintiff relies upon the New York Domestic Relations Law, section 52, which provides: "A married woman may, in her own name, or in the name of a third person, with his consent, as her trustee, cause the life of her husband to be insured for a definite period or for the term of his natural life. Where a married woman survives such a period or term she is entitled to receive the insurance money, payable by the terms of the policy, as her separate property. . . . " Plaintiff argues that the statute has the effect of establishing the wife's vested right in the policy as owner and deprives the husband of the power to surrender the policy without her consent. That this is the ordinary effect of the statute seems clear; the beneficiary's right as owner, particularly under such a statute, is unquestioned. But the beneficiary's right as owner has also been upheld in the absence of such a statute. And, as pointed out above, the majority view is that the beneficiary's ownership disappears when the power to change the beneficiary is reserved. In other words, it is not enough to say that the statute gives the beneficiary rights of ownership. The question is whether it gives such rights even where the power to change the beneficiary is reserved in the policy. The statute itself is silent on this point and there are cases holding that the benefits of such a statute do not apply where the policy contains the reserved power. (See Vance on Insurance, 2d ed., p. 561, note 90.)

Both plaintiff and defendant have cited New York decisions in support of their respective positions, and considerable conflict appears in these decisions. This conflict was, however, recognized and resolved by the New York Court of Appeals in the recent case of *Davis* v. *Modern Industrial Bank*, *supra*. A straight life policy was procured by Clarence Davis, the husband, naming his wife, Eleanor Davis, as benc-

ficiary. The policy contained clauses reserving the right to change beneficiary, and the right to assign. The husband assigned the policy to Griffiths as security, without knowledge of the beneficiary. After his death, in an interpleader suit, the insurance company paid the proceeds into court, and the assignee claimed them. It was held that he was entitled thereto. The court reviewed the important American decisions representing the majority and minority views, admitted that the New York cases contain conflicting expressions, and declared that there was no controlling decision on the question. The court then proceeded unequivocally to adopt the majority rule in the following language: "It seems to us that upon principle as well as weight of authority . . . that the insured, having reserved the right to change the beneficiary and assign the policy, did all that the law required him to do to constitute a valid transfer of the proceeds of the policy to the assignee, to the extent of the indebtedness thereby secured, in the absence of objection on the part of the company. . . .

"From an every day, practical standpoint it is desirable to hold that an assignee of a policy containing a clause permitting a change of beneficiary and an assignment of the policy secures a right in the proceeds of the policy superior to the rights of the named beneficiary. If an assignee, in the absence of the consent of the beneficiary, does not obtain such right it will be practically impossible for an insured to borrow on a policy in time of need of financial aid in those cases where compliance with the form prescribed in the policy cannot be followed. No bank or individual would be likely to lend on the security of a policy where the right to enforce the reduction of the security to cash would only mature in case the insured outlived the beneficiary, and where the continued life of the policy depends upon the payment of the annual premium . . . "

Plaintiff suggests that the Davis case is distinguishable on two grounds. The first is that it is not a "surrender" case, i. e., that the insured did not surrender the policy and take the cash value, but merely assigned it. It is said that assignment, changing the ownership but leaving the policy intact, is less drastic than surrender, or cancellation of the contract. This may be true as a description of the transaction, but the distinction has no relevancy here. The power of the insured

to assign for value and to surrender are similar in one important respect: each represents a beneficial use of the value or proceeds of the policy by the insured, and each terminates the right of the beneficiary to such value or proceeds. It is immaterial, so far as the beneficiary is concerned, whether the policy remains in existence (assignment) or is cancelled (surrender). Since he receives nothing in either case, it makes no difference to him who does. In short, the basic question is whether the beneficiary has a vested right in the policy which cannot be defeated by act of the insured. If it cannot be defeated, neither assignment nor surrender is valid; if it can, both are valid. The Davis case, holding that the beneficiary under a policy reserving power to change has no vested right, is therefore in point on the issue of this case.

The second asserted ground of distinction is that in the Davis case there was no claim that the beneficiary paid the premiums or was named as beneficiary pursuant to a contract. These are, of course, important factors, but they relate to the other issue of this case to be discussed hereinafter. On the first issue, whether the beneficiary has a vested right under New York law merely by reason of being named as such in the policy, the Davis case is conclusive.

We now come to a consideration of the second main contention of plaintiff, that she became the owner of the policy by virtue of a contract with her husband. Her testimony was that she urged her husband to procure insurance; that he refused but declared that if she wished to pay the premiums he would make the application, and said "it is your insurance." Plaintiff then had Mr. Johnson, the soliciting agent, call at her home where she described the situation to him, and it was determined that insurance should be obtained. She paid the first premium out of her earnings from her rooming and boarding house. Some time later she received the policy from the soliciting agent and placed it in a locked drawer. She continued to pay premiums from personal funds and all receipts from the company were mailed to her personally. After 1918 when she had moved to San Francisco, she made payments at the local office personally, and the receipts were handed to her. This evidence was not disputed, and it shows that as between plaintiff and her husband, she was not simply the named beneficiary in the policy, but the actual owner thereof, despite the clause reserving power to change the

beneficiary. If she had sued the insurance company before the proceeds had been paid, and plaintiff and the insured were contending between themselves for the proceeds of the policy, under the evidence just recited plaintiff would be entitled to those proceeds and could prevent the insured from surrendering the policy. In other words, once the true ownership of the policy is brought home to the insurance company, whether that ownership is established by taking out the policy in the name of the owner, or by assignment, or by contract or gift, the company is bound to recognize the rights of the lawful owner.

But in the instant case the company has already paid out the money to the named insured. It is immune from liability on another claim by plaintiff if at the time it paid the money to the insured it was not already obligated to the plaintiff. The question is whether at the time the company paid the proceeds to the insured, it had such knowledge or notice of plaintiff's ownership of the policy as to require a recognition of plaintiff's rights. It is conceded by defendant company that if there was such a contract making plaintiff the owner of the policy, adequate and proper notice thereof would be binding upon it. On this question the findings of the court are against plaintiff, and plaintiff's contention is that the evidence, including some excluded by the court, demonstrates the error of these findings.

The testimony reviewed above is not, in our opinion, sufficient to establish knowledge on the part of the company. It is possible that plaintiff might have paid the premiums voluntarily without contract, or that she might have paid them out of funds of the husband. The mere fact of receipt of the premiums from her cannot establish knowledge on the part of the company that she was the owner of the policy. Nor can the company be charged with notice of ownership of the policy in conflict with its provisions merely by reason of the casual discussion with the original soliciting agent.

The remaining testimony is, however, much more significant. It consists of three conversations, in which plaintiff and agents of defendant company allegedly participated, which conversations were excluded by the trial court on two grounds hereinafter discussed. In June, 1924, just before the policy matured, John Morrison came to San Francisco and wanted to cash in the policy, but plaintiff refused. Upon its

maturity they went to the San Francisco office of the company to inquire as to their options under the policy. There then followed the conversations which plaintiff offered to prove and which the trial court excluded. The formal offer of proof recited that she called at the office of the company with her husband, and they had a conversation with two men purporting to represent the company as agents in charge of its business in San Francisco. Mr. Morrison stated that he wanted the proceeds paid to him and the policy surrendered, but plaintiff stated that she would not permit this because the policy was hers; that she had paid the premiums and she wanted it to remain as paid-up insurance. One of the defendant's representatives then gave an explanation to plaintiff and her husband of the options in the policy and its value as paid-up insurance. Plaintiff notified them that this was the way she wanted the policy to remain. Plaintiff went back the next day and had a further conversation with the same man who assured her that her husband could not get the money without her signature. As to each conversation, plaintiff's testimony was that she asked for the "head man" and spoke with "two of the head men" from "one of the offices", in a private office behind the counter.

This was the offer of proof which the court rejected on three grounds. One ground was that the proffered evidence was inconsistent with the provisions of the policy, and an attempt to show rights in a manner not permitted by the provisions of the agreement. This objection is untenable. Despite the provisions of the policy specifying the manner in which ownership of the policy may be established, and the general provision that no agent has authority to make representations or waive any provisions of the policy, properly authorized agents of the company, or agents with apparent authority, may charge the company with notice. (See generally, Vance on Insurance, 2d ed., pp. 431, 445; 2 Couch, Cyclopedia of Insurance Law, p. 1648.) ■ And in the present case, if the responsible officers in charge of the company's San Francisco office, after being informed of the facts surrounding the issuance and maturity of this policy, and being requested to clarify the rights of the parties thereunder, stated on behalf of the company that the insured could not surrender the policy without the consent of plaintiff beneficiary, and plaintiff thereafter relied upon such statement,

the company is certainly estopped to deny those representations as to plaintiff's rights under the policy. Had it not been for these assurances, plaintiff might at that time have taken the necessary steps to regain possession of the policy, or to establish her rights thereunder. In short, the matters set forth in the offer of proof, unless controverted, were sufficient to raise an estoppel. (See Vance, *supra,* p. 534; 2 Couch, Cyclopedia of Insurance Law, p. 1508.)

■ But this assumes that the offer of proof did show representations by responsible agents of defendant, and that raises the second objection, relating to the identification of the parties concerned. Plaintiff did not name any specific person and the question is whether her description of her call at the office and her conversations in the inner office with the "head men" was a sufficient identification. In our opinion the offer was sufficient, *prima facie,* for the introduction of the testimony. There is no reason why plaintiff should be compelled to ascertain the names of those persons; that is but one method of identification. There is nothing fatally uncertain in the description of the individuals or of her conversations. If she could only say that she spoke to someone in the office, that someone might be a stenographer or clerk, not competent to bind the company. But she pointed out that she asked for those in charge, and that she was conducted to an inner office where those purporting to have authority to speak for the company, stated to her what her rights would be. In the absence of any contradiction by the defendant company, this identification should be sufficient.

The remaining objection is the failure to prove that these individuals had authority to receive notice on behalf of the company which would lead to a waiver or modification of the terms of the policy. Plaintiff was not in a position to prove actual authority, but her testimony was, in our opinion, sufficient to make out a *prima facie* case of apparent authority. She asked for, and was directed to the "head man", that is, those in responsible charge of the San Francisco office of defendant company. This was the office at which she had paid her premiums and received receipts therefor for many years. This was where she obtained her dividends. This was, indeed, the office at which the insured filed his request for the surrender of the policy.

It follows that the court erred in sustaining objections to this line of testimony, and since the testimony, if uncontradicted, would tend to establish plaintiff's right to recover, the sustaining of the objection was reversible error. The judgment should therefore be reversed in order that plaintiff may be permitted to give the rejected testimony on this issue of notice to the company of her rights. It will then be possible for defendant to impeach or contradict this evidence by any means available.

Under the view we take of the case, the defenses of laches and estoppel set up by defendant are without substance. Defendant contends that plaintiff had knowledge of her husband's assertion of sole ownership of the policy many years before her suit, and failed to take any action to establish her interests. But if her testimony is believed, she did take affirmative action by presenting her case to the representatives of defendant company in San Francisco, and she relied upon their assurances that she was fully protected.

The judgment is reversed.

Curtis, J., Shenk, J., and Knight, J., *pro tem.*, concurred.

Edmonds, J., concurred in the judgment.

Carter, J., deeming himself disqualified, did not participate in the consideration or decision of the foregoing opinion.

Rehearing denied. Carter, J., deeming himself disqualified, did not participate in the ruling.